

**FILED**
Nov 16 2015, 8:25 am
*Kevin S. Smith*
**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

John J. Schwarz, II
Schwarz Law Office, PC
Hudson, Indiana

ATTORNEY FOR APPELLEE ROBIN
LATIMER

Martin R. Lucas
North Judson, Indiana

ATTORNEY FOR APPELLEE
DMK&H FARMS, INC.

James N. Clevenger
Wyland, Humphrey & Clevenger,
LLP
Plymouth, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| John Belork, <br> *Appellant-Petitioner*, <br><br> v. <br><br> Robin Latimer, <br> Davis Township Trustee <br> and <br> DMK&H Farms, Inc. <br> *Appellees-Respondents*. | November 16, 2015 <br><br> Court of Appeals Case No. <br> 75A04-1503-MI-100 <br><br> Appeal from the Starke Circuit <br> Court <br><br> The Honorable Kim Hall, Judge <br><br> Trial Court Cause No. <br> 75C01-1406-MI-17 |

**Brown, Judge.**

[1] John Belork appeals the trial court's order granting a motion for judgment on the evidence by Robin Latimer as the Davis Township Trustee and DMK&H Farms, Inc. ("DMK&H" and, together with Latimer, the "Appellees") with respect to Belork's claim under Indiana's Partition Fence statutes found at Ind. Code §§ 32-26-9. Belork raises three issues which we consolidate and restate as whether the court erred in entering judgment on the evidence in favor of the Appellees. We affirm.

## Facts and Procedural History

[2] Belork is the owner of real property in Starke County, Indiana, which he uses in part to raise cattle. Jan Ferch is the owner of real property along the eastern boundary of Belork's property, and Ferch's farming operation includes grain production. DMK&H is the owner of real property along the southern boundary of Belork's property, and its farming operation includes grain production. At some point, Belork rebuilt portions of fencing along the eastern and southern boundaries of his property, specifically, the "southern half" of a fence along his eastern boundary which was adjoining Ferch's property and the "western half" of a fence along his southern boundary which was adjoining DMK&H's property.[1] Transcript at 24. Ferch did not complete the northern half of the fence along the Belork-Ferch property line, and DMK&H did not

---

[1] At the February 9, 2015 hearing, Belork testified that he had completed these portions of the fence ten or twelve years ago. He also indicated that, previously, there was a woven wire fence along the southern boundary of his property.

complete the eastern half of the fence along the Belork-DMK&H property line. Belork requested that Latimer as the Davis Township Trustee require Ferch and DMK&H to construct or fund the construction of the remainder of the fences along the shared boundaries. Latimer did not grant Belork's request.

[3] In June 2014, Belork filed a Petition for Writ of Mandamus pursuant to Ind. Code §§ 34-27-3 naming Latimer, as the Davis Township Trustee, as the respondent.[2] Belork alleged that his farm is used primarily for the pasturing of cows, that the land owned by Ferch and DMK&H is used for agriculture, that he had rebuilt portions of the fence along the southern and eastern boundaries of his property, and that he had requested that Ferch and DMK&H rebuild their respective portions of the fence line and they refused to do so. He further alleged that he had requested Latimer as the Davis Township Trustee to adhere to her statutory duty to see that the line fence was completed and that Latimer wholly failed after reasonable requests to do so. Belork requested that the court order Latimer to adhere to her obligations and that the court award him attorney fees. DMK&H filed a motion to intervene as a respondent, and the court granted the motion.

---

[2] Indiana Code § 34-27-1-1 abolished the writ of mandate but allows for an action called an action for mandate. *Malone v. Price*, 755 N.E.2d 213, 217 (Ind. Ct. App. 2001); Ind. Code § 34-27-1-1 ("Writs of mandate in the circuit and superior courts are abolished. Causes of action previously remedied by writs of mandate may be remedied by means of complaint and summons in the name of the state on relation of the party in interest in the circuit, superior, and probate courts as other civil actions. Such actions are to be known as actions for mandate."). As noted below, Indiana Code §§ 34-27-3 govern actions for mandate.

[4]    On February 9, 2015, the court held a bench trial at which the parties by counsel presented arguments and Belork testified. His counsel argued that Ind. Code §§ 32-26-9 "employs what has always been known as the right-hand rule," which exists where two adjoining property owners, facing each other at the center of the fence along their shared property boundary, each "agree to build [the] right half from the center of the property to the end of the property line." Transcript at 8. His counsel argued that Belork built his half of the eastern and southern fence lines but that Ferch and DMK&H have not built their respective halves and Latimer as the trustee has refused to follow the statute. DMK&H's counsel argued in part that there are overgrown trees and shrubs on Belork's property north of the fence and that it is impossible to access the fence row, that Belork maintains cattle on his property while the other farms grow grain, and that there is a history of Belork's cattle leaving his property and roaming DMK&H's fields and causing damage. DMK&H's counsel stated there had been a judgment in 2003 stemming from an injunction in 1997 to keep Belork's cattle on his own property. Belork's counsel stated it was disputed whether Belork built the western half of the new fence along the southern boundary of his property on the property line or on DMK&H's property. His counsel also stipulated that, at one point, Belork owned the property which is now owned by Ferch.

[5]     The court asked why Ind. Code § 32-26-9-1[3] applies in this situation because DMK&H did not use the fence for any purpose whatsoever. Belork's counsel stated that the statute applies if one of two adjoining parcels is agricultural. The court noted that the statute by its terms states that it applies to a fence that is "used by adjoining property owners as a partition fence." *Id.* at 34. Latimer's counsel argued that the partition fence statute applies when the fence is being used by both parties, that it makes sense for both parties to contribute to its maintenance, and that the statute does not state it applies where a fence "exists" between two parcels. *Id.* at 36. The court responded that, if both property owners receive a benefit from the fence, it would be fair for both owners to maintain the fence, and Latimer's counsel replied that such was clearly the intent of the statute. DMK&H's counsel then argued that the fence is of no benefit to DMK&H, that it is not using the fence, the fence has been in a state of disrepair for years, and that it had been in court in 2003 on the same issues.

[6]     Belork's counsel responded that, although the majority of farms in the area are grain production farmers, there is still an interest for both sides to have a fence, and that the only prerequisite for the statute to apply is that one of the parcels be used for agriculture. The court noted the statute does not refer to a fence that exists between adjoining property owners but to one that is used by the property owners, and asked Belork's counsel what evidence he had that

---

[3] Ind. Code § 32-26-9-1 provides: "A fence that is used by adjoining property owners as a partition fence, unless otherwise agreed upon by the property owners, is considered a partition fence and shall be repaired, maintained, and paid for as provided under this chapter."

DMK&H "used" the partition fence. *Id.* at 41. Belork's counsel replied that "[t]he only evidence . . . is that it is a fence that marks the property line as a partition." *Id.* Belork's counsel further stated that DMK&H was not keeping cattle, goats, sheep, or anything else loose on its property and that "I think their use is going to be limited to what marks the property line." *Id.*

[7] Belork testified that he raised cattle and used his property for pasturing them, that there had been a woven wire fence along the southern boundary of his property, and that "the new high-tensile wires actually touched the old woven wire fence post" and so the new fence is "directly on the line of the previous fence." *Id.* at 58. When asked how long the previous fence had been there, he responded that "[t]he trustee made us put it in about 1948, 1949." *Id.* at 59. He indicated that he did not have to bulldoze or excavate anything in order to install the new fence and was able to cut back branches and shrubs with nippers. When asked if DMK&H could build the eastern portion of the fence along the southern boundary of his property "under the same basically limited difficulties that you incurred," Belork answered "[i]f I built it, they should be able to build it," and when asked if DMK&H would have to bring in an excavator or bulldozer, he replied "I would hope not." *Id.* at 60. When asked if it was feasible to rebuild the previous woven wire fence, Belork testified that, "because of the open land and the wind blows from the south, it turned up the fence line and the windbreak into a sand dune and a build up of sand." *Id.* at 61. He said that the woven wire fence "would help catch it and the sand would build up underneath it" and that his cattle "just stepped across" the woven wire

fence "[b]ecause of the sand build up." *Id.* at 62. Belork also testified that he sold the property owned by Ferch to her in 2000 or 2001.

[8] On cross-examination, Belork indicated that the properties owned by Ferch and DMK&H are used primarily for growing crops. When asked what use Ferch has for the fence, he replied: "Because the sheriff has complained about trespass and cattle grazing, their wheat and corn crops, et cetera." *Id.* at 66. When asked "[s]o really, the only use of the fence for them is a protection from you; that's what you're saying," Belork answered "[t]hat's what I'm saying." *Id.* He agreed that the purpose of the fences is to keep his cattle on his property.

[9] With respect to the fence he installed, Belork testified that the posts are a maximum of thirty-three feet apart, there are spacers in between the posts to keep the high tensile wires from spreading, the fence is a straight wire fence with five wires, the top wire is forty-eight inches off the ground, and that he can electrify two of the five wires at his option which he does on occasion. When asked if he "want[ed] to insist that [he had] the right to put an electric fence on the property line," Belork replied "[i]t's my option." *Id.* at 80. Belork acknowledged that his cattle "got out of his farm" in both 2014 and 2015, and that he did not keep a tally of the number of times. *Id.* at 83. When asked how many cattle left his property in January, Belork answered "[p]robably all of them" and that he had about forty cattle. *Id.* at 84. He stated that, to keep his cattle from leaving his property, he "run[s] a second, temporary electric fence. In other words, a single wire, hot wire that keeps the cows home." *Id.* at 87-88.

[10] Following the presentation of the evidence, counsel for the Appellees moved for judgment on the evidence, arguing that they do not use the fence and thus the fence partition statute does not apply. In response, Belork's counsel argued that, if DMK&H "decides to start raising cattle or other type of animals, well haven't they just been totally benefited by [] Belork having put up the entire fence?" *Id.* at 95. His counsel asserted: "I think that's what the statute anticipates is that from time to time, some people grain farm. They may bring animals in. They may not. But there's again, there may be a time when both parties are benefiting from the use of the fence." *Id.* at 95-96.

[11] The court asked whether, in a situation where there is farmland adjacent to a subdivision and the owner of the agricultural land decided he wanted to raise cattle, "each one of those residential property owners would be required to build a fence one-half of their property to the right to keep the cattle out of coming into their children's sandbox, and the swing set," and Belork's counsel replied "[t]hat would be correct." *Id.* at 96-97. The court also noted that the statute refers to structures that can hold cattle, hogs, horses, mules, and sheep and said that the statute "is meant for the purpose of keeping your own animals on your own side of the property" and "anticipates that both property owners have livestock." *Id.* at 99. The court noted that, "[t]o me, common sense has to come into play here," that "[c]ommon sense is, right from the very beginning, a fence that is used by adjoining property owners as a partition fence," and "[t]hat means to me, this statute and this fence law is for the purpose of keeping animals inside your own property for adjoining property owners" and is "not

meant to apply to situations where . . . a property owner who has agriculture property that adjoins a subdivision in a city decides to have livestock" and is "not going to require each one of those residential areas to construct half a fence to keep the cattle from coming into their back yards." *Id.* at 99-100.

[12] The court granted the Appellees' motion and denied Belork's petition, and entered a written order granting the Appellees' motion for judgment on the evidence which included the following findings:

> 1) [Belork] directed this Court to Indiana Code 32-26-9 as the sole statutory authority to support his position.
>
> 2) I.C. 32-26-9-1 provides as follows:
>
> > "A fence that is used by adjoining property owners as a partition fence, unless otherwise agreed upon by the property owners, is considered a partition fence and shall be repaired, maintained, and paid for as provided under this chapter."
>
> 3) When one "uses" a fence, he derives a benefit from the fence.
>
> 4) The benefit contemplated by the fence addressed by the statute is the control of one's own livestock.
>
> 5) In other words, the statute sets forth the responsibilities of adjoining property owners who <u>both</u> "use" the fence to keep their livestock on their own property.
>
> 6) I.C. 32-26-9-3 reinforces that the application of the statute is to livestock when it discusses the need to secure, ". . . hogs, sheep, cattle, mules, and horses or other domestic animals."
>
> 7) It is clear that the legislature enacted the statue [sic] to set forth the respective responsibilities of adjoining land owners to maintain a partition fence to keep their livestock within the boundaries of their respective properties.

8)  If the legislature had intended to have the statute applicable to all adjoining property owners, regardless of any benefit derived from the fence, they could have simply crafted the statute to state, "A fence that <u>exists between adjoining property owners</u>, . . . ."

9)  To interpret the statute otherwise would require <u>all</u> property owners, including residential, to incur the cost of one-half of a fence to assist their neighbor in keeping his livestock on his own property.

10)  The evidence is uncontroverted that [Belork] is the only property owner with livestock and the only property owner who "uses" the fence.  Belork uses the fence to keep his livestock on his property.

11)  The evidence is uncontroverted that the adjoining property owners, DMK&H [] and [] Ferch, are grain farmers, do not "use" the fence, and derive no benefit from the fence.

12)  The Court declines to apply I.C. 32-26-9 to the uncontroverted facts of this case.

13)  [Belork] cited no statutory authority nor Indiana case law that would direct this Court to reach any other conclusion.

Appellant's Appendix at 5-6.

### *Issue and Standard of Review*

[13]  The issue is whether the trial court erred in granting the Appellees' motion for judgment on the evidence.  Indiana Trial Rule 50 provides that a motion for judgment on the evidence shall be granted "[w]here all or some of the issues in a case . . . are not supported by sufficient evidence or a verdict thereon is clearly erroneous as contrary to the evidence because the evidence is insufficient to support it . . . ."  Ind. Trial Rule 50(A).  A motion for judgment on the evidence

should be granted "only when there is a complete failure of proof because there is no substantial evidence or reasonable inference supporting an essential element of the claim." *Coldwell Banker Roth Wehrly Graber v. Laub Bros. Oil Co.*, 949 N.E.2d 1273, 1282 (Ind. Ct. App. 2011) (quoting *Raess v. Doescher*, 883 N.E.2d 790, 794 (Ind. 2008) (quoting *Dahlin v. Amoco Oil Corp.*, 567 N.E.2d 806, 810 (Ind. Ct. App. 1991), *trans. denied*), *reh'g denied*), *trans. denied*. Upon appellate review of a trial court's ruling on such a motion, the reviewing court must consider only the evidence and reasonable inferences most favorable to the nonmoving party. *Id.* at 1282-1283.

[14] Ind. Code § 34-27-3-1 governs actions for mandate and provides:

> An action for mandate may be prosecuted against any inferior tribunal, corporation, public or corporate officer, or person to compel the performance of any:
> (1) act that the law specifically requires; or
> (2) duty resulting from any office, trust, or station.

[15] An action for mandate, an extraordinary remedy of an equitable nature, is generally viewed with disfavor. *Malone v. Butts*, 974 N.E.2d 1025, 1027 (Ind. Ct. App. 2012) (citation omitted), *trans. denied*. Mandamus does not lie unless the petitioner has a clear and unquestioned right to relief and the respondent has failed to perform a clear, absolute, and imperative duty imposed by law. *Id.* (citation omitted). The mandamus action does not lie to establish a right or to define and impose a duty. *Id.* (citation omitted). Public officials, boards, and commissions may be mandated to perform ministerial acts when under a clear

legal duty to perform such acts. *Id.* (citation omitted). Mandate actions exist only where no adequate remedy at law is available. *Id.* (citation omitted).

### *The Parties' Arguments*

Belork asserts that the legislature amended the Indiana Fence Law in 2003 by adding Ind. Code § 32-26-9-0.5 to define agricultural land and that, if the legislature "intended to limit the Indiana Fence Law to situations where both adjoining landowners 'used' the partition fence, i.e. owned livestock, surely the legislature would have provided an alternative definition to 'agricultural land' or directly stated that the Indiana Fence Law only applies when all adjoining owners raise livestock." Appellant's Brief at 16.

Latimer argues that Indiana common law places a duty upon the owner of an animal to confine it, that this principle is codified at Ind. Code § 32-26-2-2,[4] that Belork conceded that the intention of the fence is to contain his cattle on his property, and that he is solely responsible for the containment of his livestock. Latimer further argues that the statute requires that the adjoining property owners "use" the fence "as a partition fence," that this "implies that not all fences are partition fences," and that "this implication is borne out by I.C. § 32-26-2-15." Appellee Latimer's Brief at 5. She also argues that no testimony or evidence suggested that fences are helpful to modern grain farming operations

---

[4] Ind. Code § 32-26-2-2(b) provides that, in the absence of adoption of an open range ordinance by the county commissioners, "if a domestic animal breaks into an enclosure or enters upon the property of another person, it is not necessary for the person injured by the actions of the domestic animal to allege or prove the existence of a lawful fence to recover for damage done."

and that nothing in the statute even remotely suggests that one of the purposes of the law is wind erosion control.

[18] DMK&H maintains that the evidence presented by Belork was not whether a partition was needed to divide the properties but rather was a request to use Ind. Code § 32-26-9-1 to force his neighbors into rebuilding a fence his cattle had destroyed and to stop his cattle from trespassing on DMK&H's lands.

### *Indiana Fence Law*

[19] The statutory provisions set forth in Ind. Code §§ 32-26 relate to fences in Indiana and address issues such as the recording of agreements to erect and repair fences and fencemarks, the enclosure of land subject to flooding, and the cutting and trimming of live fences along public highways and between adjoining lands. Partition fences are governed primarily by Ind. Code §§ 32-26-9 and certain sections of Ind. Code §§ 32-26-2.

[20] Ind. Code §§ 32-26-9 is titled "Partition Fences." Ind. Code § 32-26-9-0.5 provides:

> (a) As used in this section, "agricultural land" means land that is:
> > (1) zoned or otherwise designated as agricultural land;
> > (2) used for growing crops or raising livestock; or
> > (3) reserved for conservation.
>
> (b) This chapter does not apply to a fence that separates two (2) adjoining parcels of property unless at least one (1) of the adjoining parcels is agricultural land.

Ind. Code § 32-26-9-1 is titled "Existing fences" and provides:

> A fence that is used by adjoining property owners as a partition fence, unless otherwise agreed upon by the property owners, is considered a partition fence and shall be repaired, maintained, and paid for as provided under this chapter.

Ind. Code § 32-26-9-2 is titled "Lands outside or abutting municipal boundary" and provides:

> (a) The owner of a property that:
>> (1) is located outside;
>> (2) abuts; or
>> (3) is adjacent to;
>
> the boundary of the corporate limits of a town or city shall separate the owner's property from adjoining properties by a partition fence constructed upon the line dividing or separating the properties regardless of when the properties were divided.
>
> (b) Except as otherwise provided in this chapter, and if a division of the partition fence has not been made between the property owners for the building, repairing, or rebuilding of the partition fence:
>> (1) for a partition fence built along a property line than [sic] runs from north to south:
>>> (A) the owner whose property lies to the east of the fence shall build the north half of the fence; and
>>> (B) the owner whose land lies to the west of the fence shall build the south half of the fence; and
>> (2) for a partition fence built along a property line that runs from east to west:
>>> (A) the owner whose property lies north of the fence shall build the west half of the fence; and

(B) the owner whose property lies to the south of the fence shall build the east half of the fence.

(c) Notwithstanding subsection (b), if either property owner has constructed one-half (½) of a partition fence that is not the portion required under subsection (b) and has maintained that portion of the partition fence for a period of not less than five (5) years, the property owner may continue to maintain the portion of the fence.

(d) If a property owner fails to build, rebuild, or repair a partition fence after receiving notice under this chapter, the township trustee of the township in which the property is located shall build, rebuild, or repair the fence as provided under this chapter.

[23] Ind. Code § 32-26-9-3, titled "Defaulting landowner; description of lawful partition fence; floodgates across water courses," relates in part to the role of a township trustee and provides in part:

(a) A partition fence shall be built, rebuilt, and kept in repair at the cost of the property owners whose properties are enclosed or separated by the fences proportionately according to the number of rods or proportion of the fence the property owner owns along the line of the fence, whether the property owner's title is a fee simple or a life estate.

(b) If a property owner fails or refuses to compensate for building, rebuilding, or repairing the property owner's portion of a partition fence, another property owner who is interested in the fence, after having built, rebuilt, or repaired the property owner's portion of the fence, shall give to the defaulting property owner or the defaulting property owner's agent or tenant twenty (20) days notice to build, rebuild, or repair the defaulting property owner's portion of the fence. If the defaulting property owner or the defaulting property owner's agent or tenant fails to build, rebuild, or repair the fence within twenty (20) days, the

complaining property owner shall notify the township trustee of the township in which the properties are located of the default.

* * * * *

(d) The township trustee who receives a complaint under this section shall:

> (1) estimate the costs for building, rebuilding, or repairing the partition fence; and

> (2) within a reasonable time after receiving the complaint, make out a statement and notify the defaulting property owner of the probable cost of building, rebuilding, or repairing the fence.

If twenty (20) days after receiving a notice under this subsection the defaulting property owner has not built, rebuilt, or repaired the fence, the trustee shall build or repair the fence. The trustee may use only the materials for the fences that are most commonly used by the farmers of the community.

* * * * *

(f) A lawful partition fence is any one (1) of the following that is sufficiently tight and strong to hold cattle, hogs, horses, mules, and sheep:

> (1) A straight board and wire fence, a straight wire fence, a straight board fence, or a picket fence four (4) feet high.

> (2) A straight rail fence four and one-half (4 ½ ) feet high.

> (3) A worm rail fence five (5) feet high.

Other subsections of Ind. Code § 32-26-9-3 relate to, among other things, when a fence is sought on a township line, when a trustee is disqualified to act, when a ditch or creek crosses the division line between two property owners, and when floodgates or similar structures should be constructed. *See* Ind. Code §§ 32-26-9-3(c), (e), (g)-(m).

Ind. Code § 32-26-9-6 (eff. Jul. 1, 2003),[5] titled "Construction and application of law," provides:

> This chapter shall be liberally construed in favor of the objects and purposes for which it is enacted and shall apply to all agricultural land, whether enclosed or unenclosed, cultivated or uncultivated, wild or wood lot.

In addition, several sections of Ind. Code §§ 32-26-2, titled "Enclosures, Trespassing Animals, and Partition Fences," relate to partition fences. In particular, Ind. Code § 32-26-2-15 is titled "Existing fence becoming partition fence; compensation" and provides:

> When a fence that is already erected becomes a partition fence because previously unenclosed property is enclosed, the person who encloses the previously unenclosed property shall pay to the owner of the existing fence fifty percent (50%) of the value of the existing fence, as estimated by the owner of the existing fence.

Ind. Code § 32-26-2-18 is titled "Notice; intention to remove partition fence" and provides:

> This section applies to a person who ceases to use the person's property or opens the person's enclosures. A person to whom this section applies may not remove any part of the person's fence that forms a partition fence between the person's property and the enclosure of any other person until the person to whom this section applies has first given six (6) months notice of the

---

[5] Ind. Code § 32-26-9-0.5 became effective on July 1, 2003, and Ind. Code § 32-26-9-6 was amended, effective on that date, to include the word "agricultural" in referring to "agricultural land." *See* Pub. L. No. 57-2003, §§ 1-2 (eff. Jul. 1, 2003).

person's intention to remove the fence to any person who may be interested in the removal of the fence.

## *Discussion*

We address whether the fences that exist and the fences Belork desires to be erected along the southern and eastern boundaries of his property constitute or would constitute partition fences under Ind. Code §§ 32-26-9 requiring DMK&H and Ferch to construct or fund the construction of portions of the fences. The first step in interpreting a statute is to determine whether the legislature has spoken clearly and unambiguously on the point in question. *City of N. Vernon v. Jennings Nw. Reg'l Utils.*, 829 N.E.2d 1, 4 (Ind. 2005). When a statute is clear and unambiguous, we need not apply any rules of construction other than to require that words and phrases be taken in their plain, ordinary, and usual sense. *Id.* When a statute is susceptible to more than one interpretation, it is deemed ambiguous and thus open to judicial construction. *Id.* When faced with an ambiguous statute, our primary goal of statutory construction is to determine, give effect to, and implement the intent of the legislature. *Id.* To effectuate legislative intent, we read the sections of an act together in order that no part is rendered meaningless if it can be harmonized with the remainder of the statute. *Id.* We also examine the statute as a whole and do not presume that the legislature intended language used in a statute to be applied illogically or to bring about an unjust or absurd result. *Id.* at 4-5.

Ind. Code § 32-26-9-1 provides that a fence that "is *used* by adjoining property owners *as a partition fence* . . . is considered a partition fence and shall be

repaired, maintained, and paid for as provided under this chapter." (Emphases added). According to this section, in order for the provisions of Ind. Code §§ 32-26-9 to govern, a fence must be "used" by both adjoining property owners "as a partition fence" in order for the partition fence statues to be applicable.

[28] Ind. Code § 32-26-9-0.5(b) provides that the partition fence chapter does not apply "unless at least one [] of the adjoining parcels is agricultural land." Reading Ind. Code §§ 32-26-9-0.5 and -1 together so that neither section is rendered meaningless and both may be given effect, in order for the partition chapter to apply to a fence separating two adjoining parcels, the requirements of both sections must be satisfied. In particular, the provisions of Ind. Code §§ 32-26-9 govern a fence between two adjoining parcels where: (1) one of the two parcels is agricultural land under Ind. Code § 32-26-9-0.5 (providing the chapter does not apply "unless at least one [] of the adjoining parcels is agricultural land"); and (2) the fence is "used . . . as a partition fence" by the adjoining property owners. *See* Ind. Code § 32-26-9-1 (providing a fence "that is used by adjoining property owners as a partition fence" is governed by the chapter). While the legislature enacted Ind. Code § 32-26-9-0.5 effective in 2003 to provide the partition fence chapter was applicable where at least one of two adjoining parcels was agricultural land, it did not amend or revise the language of Ind. Code § 32-26-9-1 providing that the chapter applied to fences used as partition fences.

[29] Further, several other sections suggest that a fence on the dividing line between two parcels may or may not necessarily be "used . . . as a partition fence." Specifically, Ind. Code § 32-26-2-15 relates to an existing fence becoming a partition fence and provides in part that, when a fence "that is already erected *becomes a partition fence* because previously unenclosed property is enclosed, the person who encloses the previously unenclosed property shall pay to the owner of the existing fence fifty percent (50%) of the value of the *existing fence*." (Emphases added). Ind. Code § 32-26-2-18 applies "to a person who *ceases to use*" the person's property and provides that the person "may not remove any part of the person's fence *that forms a partition fence*" without first complying with certain notice requirements. (Emphases added). By stating that a fence already erected can become a partition fence, and that a person can cease to use the person's property and remove a fence, a part of which is a partition fence, these sections appear to indicate that a fence along a shared boundary may or may not necessarily be "used by adjoining property owners as a partition fence."

[30] Turning to the evidence before the trial court, we observe that the parties do not dispute that Belork would use fences constructed along the southern and eastern boundaries of his property to hold his cattle. Belork testified that the fence would help keep his cattle on his property. When asked "[s]o really, the only use of the fence for them is a protection from you; that's what you're saying," Belork answered "[t]hat's what I'm saying." Transcript at 66. Also, when asked "and the intention of having these fences is to keep your cattle on your

property," Belork answered "Yes."[6] *Id.* at 67. Latimer argued that the partition fence statute applies to a fence which is used by both adjoining parcel owners and not to a fence which merely exists between two parcels, and DMK&H argued that the fence is of no benefit to it and that, as a grain farmer, it is not using the fence. The trial court was not required to credit Belork's unsupported assertions that the fences would constitute capital improvements for the DMK&H and Ferch properties or control wind erosion such that the fences would be "used . . . as partition fences" by DMK&H and Ferch.

[31] While Ind. Code §§ 32-26-9 provides a mechanism for adjoining parcel owners to share in the cost of maintaining a partition fence, the statute does not require township trustees or the courts to find that every fence on a shared boundary is used as a partition fence under Ind. Code § 32-26-9-1. In expressly providing that it governs a fence that is "used . . . as a partition fence," a phrase which has

---

[6] As to protection from cattle, statutory mechanisms exist by which a property owner may obtain compensation from the owner of the animal which has caused damage, *see* Ind. Code §§ 32-26-2-2 to - 14; *see also Blake v. Dunn Farms, Inc.*, 274 Ind. 560, 413 N.E.2d 560, 563 (1980) (observing that the keeper of an animal has the duty and responsibility to provide for the restraining and confinement of that animal), and, absent the adoption of a township ordinance allowing animals to run at large in unenclosed public areas which Belork has not established, Belork has the responsibility of confining his cattle and is responsible for the damage caused by his cattle upon entering the property of another person. *See* Ind. Code § 32-26-2-2(b) (stating that it applies in a township which has not adopted an ordinance allowing animals to run at large in unenclosed public areas and providing that, "[i]f an animal enters upon the property of another person, it is not necessary for the person injured by the actions of the domestic animal to allege or prove the existence of a lawful fence to recover for damage done"); Ind. Code § 32-26-2-1 (providing a "'lawful fence' means any structure typically used by husbandmen for the enclosure of property"); *see also* Ind. Code § 32-26-2-2(a) (stating that it applies in a township which has adopted an ordinance that allows domestic animals to run at large in unenclosed public areas and providing that, "[i]f a domestic animal breaks into an enclosure or enters upon the property of another person that is enclosed by a lawful fence, the person injured by the actions of the domestic animal may recover the amount of damage done").

not been altered in many years by the legislature, the Indiana partition fence statute provides township trustees and courts with the ability or latitude to avoid a possibly unwarranted or harsh result of requiring adjoining parcel owners to equally contribute to the costs of a fence between them, where, as a practical matter, the fence is used solely by one of the owners and requiring a shared contribution would not be equitable under the circumstances. *See Matter of Estate of Wallis*, 659 N.E.2d 423, 428 (Ill. Ct. App. 1995) (affirming the decision of the trial court not to impose the costs of a new fence on a parcel owner where the fence would be of no value to that owner and observing that the state's partition fence statute stated landowners were responsible for "a just proportion" of a fence dividing their properties, that "[t]he nature of this phrase indicates its intended flexibility so as to be able to consider the circumstances in each individual case," and that the legislature had not altered the statutory language in many years).[7] The trial court here determined that the evidence was that DMK&H and Ferch do not use, and derive no benefit from, the fences

---

[7] To the extent Belork cites to *Glass v. Dryden*, 248 N.E.2d 54 (Ohio 1969), *Gravert v. Neberall*, 539 N.W.2d 184 (Iowa 1995), and *In re Petition of Bailey*, 626 N.W.2d 190, 193 (Minn. Ct. App. 2001), which addressed the constitutionality of the fence statutes in those states, he does not argue that the statutes discussed in those cases are similar to Indiana's statute or similarly limited their applicability to fences used as partition fences by adjoining parcel owners. *See* Ohio Rev. Code §§ 971.01 (providing a partition fence is one "located on the division line between the adjoining properties of two owners"); Iowa Code § 359A.1A (providing that "[t]he respective owners of adjoining tracts of land shall upon written request of either owner be compelled to erect and maintain partition fences, or contribute thereto, and keep the same in good repair throughout the year"); Minn. Stat. Ann. § 344.02 (providing "[i]f adjoining land owners disagree as to the kind of fence to be built on any division line, the matter must be referred to the fence viewers, who shall determine what kind of fence should be built on the line and order it built").

and thus declined to apply Ind. Code §§ 32-26-9 to the facts of this case. The determination reached by the trial court is fair under the circumstances.

[32] Based on Ind. Code §§ 32-26-9 and the evidence, we conclude that the fences Belork desires along the southern and eastern boundaries of his property would not constitute partition fences under Ind. Code §§ 32-26-9. We do not disturb the trial court's order denying Belork's petition for writ and granting the Appellees' motion for judgment on the evidence.

## *Conclusion*

[33] For the foregoing reasons, we affirm the order of the trial court.

[34] Affirmed.

Riley, J., and Altice, J., concur.